ILLINOIS CENTRAL RAILROAD COMPANY v. AARON G. COMFORT.

[53 South. 422.]

1. RAILROADS. *Master and Servant. Rules of company. Construction.*

    A rule of a railroad company requiring enginemen to respond promptly to signals of flagmen, and providing that they must not pass the flagmen until they ascertain the reason for being flagged, is complied with, where a freight train of thirty-two cars, with good appliances and operated by a competent engineer, stopped when the engine, tender, and three cars had passed the place where the flagman stood; and the rule does not justify a flagman in assuming that a train flagged will stop before it reaches him.

2. SAME. *Same. Contributory negligence.*

    A flagman, flagging a train, must exercise prudence for his own safety, though he may rely on the rule requiring enginemen to respond to signals of flagmen, and not to pass a flagman until the reason for being flagged has been ascertained; and where a flagman knew, from the speed of the train, that it could not stop before it reached the place where he stood, he must step back from the path of the train.

3. SAME. *Same. Flagman on track. Presumption.*

    An engineer, seeing a flagman near the track engaged in flagging his train, may assume that he will move out of the path of the approaching train, where he is in such a position that he may do so.

FROM the circuit court of Attala county.

HON. GEORGE A. McLEAN, Judge.

Comfort, appellee, was plaintiff in the court below; the railroad company, appellant, was defendant there. From a judgment in plaintiff's favor the defendant appealed to the supreme court. The facts are fully stated in the opinion of the court.

*Mayes & Longstreet,* for appellant.

The real point in this case was that the company is liable according to plaintiff's view, for the reason that when the engineer

of the southbound freight train was signalled to stop, he did not stop his train quickly as he should have done; that he ought to have stopped it before the engine reached the spot on which the flagman was standing when he gave the signal; that it was negligence of the engineer to allow any part of his train to run by that spot; this theory is sought to be worked out by putting in evidence a rule of the railroad company, which rule was as follows:

"Enginemen must respond promptly and make answer to signals, and must not pass the flagman until they ascertain the reason for being flagged. They must be alert in all matters pertaining to the protection of their trains, and when it becomes evident to them that their rear protection will be required they must immediately whistle out the flagman and repeat the signal until protection is assured."

The case comes down to a question of the construction of that rule, or rather of the application of it.

It is impossible to avoid the conclusion that the only pretense on which to base a verdict was the claim that the engineer, as the expression is, ran over the flagman's stop signal.

Under the conditions of this case the claim is preposterous.

The act of the engineer, which is called running over his stop orders, consisted solely in the fact that he did not so immediately stop his train as to bring it to a full stop before the engine reached the place where the flagman was standing.

What constitutes a passage of the flagman within the meaning of that rule? It appears that in this case the train was composed as follows: An engine, a tender, and thirty-two cars. As the plaintiff himself shows, when the engineer was flagged he stopped his train so promptly that the only car which ran by the spot where the flagman was standing, were the engine, the tender and three of four of the cars in the train. In other words, counting the engine as a car and the tender as a car, there were thirty-four cars in the train. The cars, including the engine

and tender, which ran by the spot where the flagman was standing before the train came to a full stop according to the plaintiff's own showing, were six out of thirty-four. In other words, the train was stopped when only one-sixth of its length had gone by the place where the engineer was, and five-sixth of it was still north of him.

When the train came to a full stop, the engine was a half mile from the gravel train, for the protection of which the flag was given, and the track was straight.

The court in this connection might well remember that this stop was not in fact an emergency stop. The engineer had seen the work train and had shut off steam before he was flagged, and was figuring on stopping somewhere close to the flagman.

There is a complete failure on the part of the plaintiff to show any violation of the rule, and certainly a complete failure to show any negligent violation, which is necessary to uphold this verdict.

*Teat & Niles* and *Watkins & Watkins,* for appellee.

The rule of the company arbitrarily says "Enginemen must respond promptly and make answer to signals, and must not pass a flagman until they ascertain the reason for being flagged." We call special attention to the word "enginemen." This certainly does not mean a train of cars approximately a quarter of a mile long. The rule is bred of necessity. There could be no more reasonable rule than this one. The flagman is a messenger of danger ahead. The message which he has is to the engineer and which the engineer should receive at the point occupied by the flagman. The safety of the lives and of property depends upon the strict observation of this rule. The engineer who runs by a flagman over a stop signal is not only unfaithful to his master, but necessarily jeopardizes both life and property. There are two persons who are obliged to act upon this rule, the flagman and the engineer.

Their mutual safety depends upon the strict observation of it. The flagman protects the engineer from danger, and when the flagman himself is in peril, it is the duty of the engineer to protect him. The flagman in the service of his master walks along a dangerous track, facing an approaching train, inherently dangerous, and takes a great risk of his personal safety on account especially of the existence of this rule. The rule is his guaranty of protection and his warrant for his exposure to peril incurred by going on top of a long, tall, embanked road, whose edges are strewn with rows of treacherous gravel, as in the instant case. Much more is it true in a straight track of this character, where a signal can be received at long range, and where repeated responses are returned. Every response given by the blast of the engineer's whistle, is an assurance to the flagman that the engineer is cognizant of his situation. The impulse to flight for safety down the embankment is thus dissuaded and confidence restored by virtue of the rule and the response. If by way of illustration, this approaching freight train has been running at regular speed and no response to flagman's signal, it would have required a suicidal intent for this flagman to have stood on the narrow base of two and one half feet of ground, covered with cone-shaped gravel, placing the center of his body within fifteen inches of a rapidly moving ten foot cross-beam of the engine. These are facts determined in the light of after investigation, but are not known to the flagman in the moment of peril. We again say that to thus remain is the act of great confidence which the rule alone warrants.

McLain, C.

This is an appeal by the Illinois Central Railroad Company from the circuit court of Attala county, from a judgment of $5,000 rendered against it, in favor of appellee, Comfort, for personal injury suffered by him in the crushing of his foot by defendant railroad company. The only assignment

of error submitted to the court by appellant is that the defendant below should have had a peremptory instruction as asked. To have a clear conception of the legal point involved, it is necessary to give some of the leading facts.

From the record it apears that plaintiff was a young man about twenty-two years old, and had had some railroad experience. He had been employed by the railroad company as fireman, and he quit this position and sought the one of flagman. On November 4, 1909, he was employed as a flagman on a gravel train of defendant, and on this very day this deplorable accident occurred. This gravel train on that day was unloading gravel at a point three miles south of West, Miss., and about a half mile north of a flag station, known as Hoffman. The unloading was done by means of a drop door from the bottom of the car, the gravel falling out upon the ends of the cross-ties, and it appears that it was then leveled off by means of a common cross-tie being placed in front of the rear wheels and then pulled over the gravel. By this means the gravel was practically leveled, but at each end of this tie, on either side of the roadbed, much of the gravel was forced in such manner as to leave a continuous row of gravel at the ends of the ties. This was the condition of the roadbed at the point where the tragedy occurred. At this point the roadbed was on an embankment about fifteen feet high, sloping on either side down to the level ground. Where this occurred was on a part of an embankment extending across a bottom for a distance of about two miles.

The conductor of the gravel train ordered the plaintiff to go north and flag down a south-bound train then due. After going north about one-half mile, he saw the freight train approaching from the north, and when it was in about one-quarter of a mile of him he signaled it to stop. The engineer blew two blasts upon his whistle, indicating to the flagman that he saw the signal and would stop in obedience to and in conformity to a rule of the company, which says: "Enginemen must respond promptly

and make answer to signals, and must not pass the flagman until they ascertain the reason for being flagged. They must be alert in all matters pertaining to the protection of their train, and when it becomes evident to them that their rear protection will be required, they must immediately whistle out the flagman and repeat the signal until protection is assured." Plaintiff then stepped to the west side of track, getting upon the row of gravel which lay at the end of the cross-ties, which row of gravel was about twenty or twenty-four inches high. The roadbed at this point was about fifteen feet wide, and the cross-beam of engine approaching was ten feet in length, thus placing the plaintiff in line with, or in very close proximity to, the path of the movement or sweep of the train. At this point the railroad was perfectly straight several miles north and for some distance south.

Counsel in his brief says: "We wish to call the attention of the court to the fact that we base the negligence of the engineer in charge of the approaching freight train upon two theories: First, that he was negligent in disregarding the rule; second, that the appellee's position of peril was well known to him, and, not being a fellow servant of the appellee, the railroad company is liable for his negligence in running down upon the appellee in his perilous condition." Plaintiff takes the ground that the obvious purpose of the rule, above quoted, was to require the engineer to stop his engine before he reached the flagman, in order that he might ascertain the purpose of being stopped. He seeks to excuse and justify his conduct, and to fix liability upon the defendant, on the ground that from this rule he had a right to assume, and did assume, that the train would stop before it got to him. Therefore, in the absence of any knowledge to the contrary, it was an assurance, on which he was justified in relying that it would stop before it reached him, and that he had a right to stand where he did.

We will first inquire: Did the engineer disregard the rule? On this point the engineer says: "Q. Well, then, your train was running from its own momentum? A. Yes, sir; it was slightly

down hill. Q. You put on your brakes? A. Yes, sir. Q. What did you put them on full for? A. I was figuring on stopping near the flag—you see we have no special rule to stop exactly. Q. You know you ran over your signal? A. No, sir. Q. As a matter of fact? A. No, sir. Q. You are well aware of the fact that if you run this train over orders, you would be discharged from service? A. Yes, sir. Q. Over signals? A. Yes, sir. Q. You are conscious of that fact when you are testifying here, are you? If it is proven that you ran over the signals and cut that fellow's foot off, you would be discharged from service? A. No sir; because I did not run over a signal." It is further in evidence that the freight train and its appliances were in good order, that the engineer was competent and diligent, and that the train on the occasion in question was carefully handled. It is further shown that the train was composed of an engine a tender, and thirty-two cars and that the only part of the train that passed the spot where the flagman was standing was the engine, the tender, and three or four of the cars of the train. Counting the engine as a car, and the tender as a car, there were thirty-four cars in the train. According to the plaintiff's own showing, the engine, the tender, and three cars passed the spot where he was standing. From this we see the train was stopped when only about one-sixth of its length had gone by the place where the flagman was standing, and about five-sixths of it was still north of him. We think these facts show that the engineer did substantially comply with the above-mentioned rule. We think this construction gives it a practical and common-sense interpretation. To give it the construction that the plaintiff seeks to place upon it would be to give it a strained and unreasonable one.

We will next inquire: Was the plaintiff guilty, under the circumstances which the evidence discloses, of contributory negligence? The plaintiff contends "that his position of peril was well known to the engineer of the freight train, and, not being

a fellow servant of the appellee, the railroad company is liable
for his negligence for running down upon the appellee in his
perilous, condition." We will first give the plaintiff's own ver-
sion of this affair. We will first note that, as the south-bound
train approached, the signal being answered, as plaintiff puts it,
plaintiff then stood to one side of the track, on top of the row of
gravel deposited there, and about two and one-half feet to the
west of the track, he facing north. Plaintiff, when on the stand
said: "It came by me about twelve miles an hour, and as it ap-
proached me there I turned my back west and faced east, with
my right foot in front of my left one, standing on the gravel, and
the front of the engine run by me so fast that I went to get out
of the way, and the gravel gave way under me, and I fell under
the tender. Q. You wanted to get back where? A. Get out of
the way, to keep the train from hitting me. Q. How came you
so close to that—the rails up there? A. I had to stand there to
give the orders to the engineer. There was no other place to
stand, unless I got down the embankment." In another portion
of the record he said, in reference to the train as it approached
him: "Q. Now, in looking at that train, as I understand it, you
were near about the front of it. Is that true? A. Yes, sir.
Q. Could you tell how rapidly it was coming to you until it got
to you? A. No, sir; it looked like it was sort of down grade,
and it was coming down grade. Q. Now, you expected it to
stop, as you say? A. Yes, sir. Q. And when it got right at
you, you made a struggle to get out of the way? A. Yes, sir.
Q. And your right foot fell on the track, you say? A. Yes, sir."

Assuming that the plaintiff did believe that, under the rules
of the company, the freight train was going to stop before it
reached him, that did not absolve him from the duty of exercis-
ing prudence, care, and common sense. The train was running
at the rate of twelve miles an hour, so he says. By the use of
his faculties, he ought to have known from the speed of the
train that it could not stop before it reached the place where he

was standing, and he should have, knowing the perilous position which he was in, taken steps earlier than he did to get back from the path of the train.    Under the facts and circumstances in the case, the engineer had a right to assume that plaintiff would move out of the sweep or path of the approaching train.

We cannot resist the conclusion that the deplorable accident which befell the plaintiff was attributable to his own lack of caution, and was not due to the negligence of the defendant.

PER CURIAM.    For the reasons set forth in the above opinion by the commissioner, the judgment is reversed and cause re-. manded. ·